THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DEMETRIO GONZALEZ, Appellant.

Second Department, September 30, 1991

APPEARANCES OF COUNSEL

*Philip L. Weinstein (Arthur H. Hopkirk* of counsel), for appellant.

*Charles J. Hynes,* District Attorney (*Jay M. Cohen, Michael Gore, Robyn G. Nir* and *William Harrington* of counsel), for respondent.

## OPINION OF THE COURT

LAWRENCE, J.

The defendant was charged, *inter alia,* with kidnapping in the second degree (Penal Law § 135.20), assault in the second degree (two counts) (Penal Law § 120.05 [2], [6]), attempted rape in the first degree (Penal Law §§ 110.00, 130.35 [1]), and attempted sexual abuse in the first degree (Penal Law §§ 110.00, 130.65 [1]), based on events which allegedly occurred on November 28, 1987, involving the complainant. The indictment also charged the defendant with similar counts based on events which allegedly occurred on February 13, 1988, involving another woman, but these latter counts were dismissed at the end of the People's case.

The only evidence of the defendant's alleged criminal acts committed on November 28, 1987, consisted of the testimony of the complainant, who first reported the incident to the police on February 14, 1988, when the police came to interview her in connection with the reported attack on the other woman. The complainant specifically testified that on the afternoon of November 28, 1987, she brought her three oldest children to her neighbor's apartment. She intended to go to Woodhull Hospital to fill a prescription. The defendant was present and volunteered to go downstairs and call a taxicab for her. It was about 4:15 P.M. or 4:30 P.M. when the complainant entered the taxicab. The defendant then suddenly climbed in behind her and told the driver to "pull off" and "keep driving". The ride lasted "more than 10 minutes" and "[m]aybe about two hours". At the outset, the defendant told the complainant that she was going to "pay" for what everyone had done to him. When the complainant indicated that she did not know what the defendant was talking about, the defendant kept repeating that she was "paying" for what had happened to him, and she should shut up. The defendant then began to hit the complainant about her face with his fists. He continually assaulted her throughout the ride, and at one point, he struck her in the back of her head with a gun. The defendant further stated that he would kill the complainant because she "was paying for what everybody did to him".

The defendant also asked the taxicab driver if he wanted to

watch him (the defendant) kill the complainant. At another point, the defendant told the complainant that if she told anyone about what happened in the taxicab, he would kill her son. As darkness set in, the taxicab ride ended at a vacant parking lot somewhere in Brooklyn. The complainant could not recall the lot's exact location, but estimated that it was about two miles from her home. At the parking lot, the defendant pulled the complainant out of the taxicab. The defendant again threatened to kill the complainant's son if she screamed, and he invited the taxicab driver to punch the complainant. The taxicab driver punched the complainant in her mouth with his fist. The defendant continually screamed at the complainant; he again struck her in the back of her head with the gun, and he punched her in her stomach, causing her to fall to the ground. As she passed into unconsciousness, the defendant told the complainant that he was going to rape her. The complainant awoke as it was getting light, the next morning. She was only clothed in her shirt and socks, she had a lump on her head, her stomach and vagina felt sore, and her legs felt sore, "wet" and "sticky". She found the rest of her clothes strewn about the parking lot. While the complainant claimed that someone "must have" done something to her and that she was raped based on her physical condition when she awoke, she conceded that she did not see or feel the defendant, the taxicab driver, or anyone else touch her "in a sexual way". Although the complainant was four months' pregnant at the time of the alleged incident, and despite the alleged violent nature of the attack, there was no evidence presented that she sought any medical treatment for her injuries. Further, the complainant's former sister-in-law, who saw the complainant the morning after the alleged incident, testified that the complainant only had a lump on her head—its size was undisclosed—and a bruised lip.

At the end of the case, the trial court dismissed the counts of assault in the second degree for lack of proof, and declined to submit attempted sexual abuse in the first degree to the jury, because "there is no view [of evidence] other than Attempted Rape". The jury acquitted the defendant of attempted rape in the first degree, and convicted him solely of kidnapping in the second degree, based on the alleged asportation and detention of the complainant during the ride in the taxicab.

We agree with the defendant that the evidence presented at the trial requires reversal of his kidnapping conviction which

is precluded by the merger doctrine. The application of the merger doctrine under the circumstances herein is entirely consistent with the purpose thereof, which is "to preclude conviction for kidnapping based on acts which are so much the part of another substantive crime that the substantive crime could not have been committed without such acts and that independent criminal responsibility may not fairly be attributed to them. 'It is this kind of factual merger with the ultimate crime of the preliminary, preparatory, or concurrent action that the rule is designed to recognize, and thus prevent unnatural elevation of the "true" crime to be charged. It is a merger suggestive of, but not quite like, the merger of the preparation and attempt with the consummated crime, a familiar concept in the criminal law' *(People v Miles,* [23 NY2d 527], 539 *[cert denied* 395 US 948]; consider *People v Richette,* 33 NY2d 42, interpreting Penal Law, § 110.00.)" *(People v Cassidy,* 40 NY2d 763, 767; *see, People v Cain,* 76 NY2d 119, 124-125; *People v Smith,* 47 NY2d 83; *People v Lombardi,* 20 NY2d 266; *People v Levy,* 15 NY2d 159, *cert denied* 381 US 938.) Moreover, the alleged horrendous nature of the defendant's behavior in this case derives not from the manner of detention, but rather from the defendant's alleged assault and attempted sexual crimes on the complainant, which charges were either dismissed because of lack of proof, or not credited by the jury, also apparently because of a lack of proof *(see, People v Burgess,* 107 AD2d 703; *People v White,* 88 AD2d 940; *People v Dolan,* 51 AD2d 589, *affd* 40 NY2d 763).

While the merger doctrine may not be applicable in situations where the abduction is effectuated for purposes of murder *(see, People v Miles, supra; People v Carmichael,* 155 AD2d 983; *cf., People v Wachtel,* 124 AD2d 613), in the context of the entire tenor of the incident herein, the evidence at best only showed that the defendant intended to assault the complainant, and commit sex offenses against her, and that the defendant's alleged query to the taxicab driver as to whether he wanted to watch the killing of the complainant, and his alleged statements that he would kill her and her son, were idle threats *(see, People v Burgess, supra; see also, People v Usher,* 49 AD2d 499, 507, *affd* 40 NY2d 763; *cf., People v Miles, supra; People v De Meo,* 139 AD2d 758; *People v Wilsey,* 99 AD2d 877).

We find no merit to any argument that the defendant's conviction should stand because he was only convicted of

kidnapping in the second degree. The merger doctrine may be applied despite the acquittal or dismissal of the other charges into which the kidnapping merges *(see, People v Usher, supra,* at 507; *People v Knight,* 161 AD2d 668, 669; *People v Salimi,* 159 AD2d 658; *People v Jackson,* 63 AD2d 1032; *see also, People v White,* 88 AD2d 940, *supra).* A review of those cases wherein the merger doctrine has been rejected when kidnapping is the sole count charged clearly indicates that the underlying reason for such preclusion is not the fact that no other crime was charged but that there is "a total absence of *any evidence of the commission or attempted commission* of any other crime to which the abduction of the victim was incidental or inseparable from, and therefore there was nothing into which the kidnapping could merge" *(People v Dodt,* 92 AD2d 1063, 1064 [emphasis supplied], *revd on other grounds* 61 NY2d 408; *see, People v Kalyon,* 142 AD2d 650; *People v Tocco,* 114 AD2d 385; *People v Cresci,* 112 AD2d 246; *People v Rios,* 88 AD2d 1056, 1057, *affd* 60 NY2d 764; *see also, People v Balcom,* 171 AD2d 1028 [the Fourth Department did not specifically discuss the merger doctrine in affirming the defendant's kidnapping conviction]). Thus, our determination does not, as our dissenting colleagues contend, "put an unwarranted and inappropriate premium on draftsmanship", in that it cannot and should not be read to permit the People to circumvent the merger doctrine by only charging the crime of kidnapping in the second degree.

In *People v Usher (supra,* at 501), which cannot be factually or legally distinguished from the case herein, "[t]he victim was accosted at knife point by the defendant and a confederate * * * at about 12:15 A.M., as she was walking home from work. She was forcibly taken to a vacant building, a distance of a minute's walk away, where they took some change from her pocketbook. She was then taken to a room in an adjoining building where she was raped by both men. The time interval of the whole incident was approximately 25 minutes". The defendant was charged with robbery, grand larceny, and kidnapping, but he was not indicted for rape owing to a lack of corroborative evidence which was then required by statute *(see, People v Usher, supra,* at 500-501). After trial, the defendant was acquitted of the robbery and larceny charges, but convicted of the kidnapping charge *(see, People v Usher, supra,* at 500). In determining that the kidnapping conviction could not stand, this court rejected the argument that the defendant's acquittal on the robbery charge permitted the jury to

consider the kidnapping charge, stating that the acquittal did not "in some way [create] a vacuum in which the jury could view the charge of kidnapping in the second degree in total isolation from the facts in the case and contrary to the prosecution's own theory that a robbery and a larceny actually had taken place" *(People v Usher, supra,* at 507). Similarly, in this case, the charge of kidnapping in the second degree cannot be viewed in total isolation from the facts in the case and contrary to the prosecution's own theory that an assault and an attempted sexual crime had taken place. The true crime charged herein was, as our dissenting colleagues note, the alleged "violent rampage of an armed intruder". "[T]he confinement in the [taxicab] was only the incidental means to the accomplishment of th[e] assault [and attempted sexual crime]" *(People v Cassidy,* 40 NY2d 763, 768). Further, our dissenting colleagues' reliance on the length of the "abduction" is misplaced since similar restraints of 1½ *(see, People v Dolan,* 40 NY2d 763, 768, *supra)* and 3½ hours *(see, People v White, supra),* have not precluded the application of the merger doctrine.

Finally, the cases in which merger was foreclosed, relied upon by our dissenting colleagues, are clearly distinguishable because they either do not reach the issue of whether the merger doctrine is applicable *(see, People v Morales,* 148 AD2d 325), or involve situations concerning the taking of a hostage by the defendant *(see, People v India,* 67 AD2d 488), or a restraint or abduction by the defendant after the completion of other crimes *(see, People v Miles, supra; People v Epps,* 160 AD2d 171, 172; *People v Salimi, supra; People v Piotter,* 142 AD2d 939; *see also, People v Smith, supra,* at 87; *People v Brown,* 112 AD2d 1087; *People v Wilsey,* 99 AD2d 877, *supra).*

In light of our determination, we need not address the defendant's other contentions.

ROSENBLATT, J. (concurring in part and dissenting in part). I respectfully disagree with the majority insofar as it applies the kidnapping-merger doctrine to this case. In essence, the majority reasons that the defendant's conviction for kidnapping may not be abided because the kidnapping was "only incidental" to the assault and sex crimes, and merges into them. The various sex and assault counts, however, were either dismissed or not proved, and so under the majority view the kidnapping not only merges, it disappears. The legal result is an expansion of the merger doctrine to lengths that

carry it well beyond its purpose and origins. As a practical matter, it absolves the defendant from any criminal responsibility even though the jury found, and the record clearly supports, that he abducted his victim and subjected her to a prolonged episode of unremitting terror and physical brutality.

In my view, however, a new trial is warranted because the defendant suffered undue prejudice when the prosecutor presented evidence and allegations of another, unrelated series of crimes. The indictment charged two separate criminal transactions committed against two different women, on different dates. As to the events of November 28, 1987 (the crimes at issue here), the defendant was charged with kidnapping in the second degree (Penal Law § 135.20), two counts of assault in the second degree (Penal Law § 120.05 [2], [6]), attempted rape in the first degree (Penal Law §§ 110.00, 130.35 [1]), and attempted sexual abuse in the first degree (Penal Law §§ 110.00, 130.65 [1]). In the second series, the defendant was charged with having kidnapped, assaulted, and sexually abused another woman, on February 13, 1988. The prosecutor, in his opening statement, described both sets of crimes, and then presented an "outcry" witness who testified that the second woman told of having been kidnapped and assaulted by an unnamed assailant. As the trial proceeded, it became evident that the second woman would be unavailable to testify, and the defendant moved for a mistrial, which the court denied. At the conclusion of the trial the court dismissed the counts relating to the second woman.

In many cases the prejudice resulting from inadmissible evidence or unfulfilled openings may be blunted or eliminated by judicial instructions (see, People v Blyden, 142 AD2d 959; see also, De Vito v Katsch, 157 AD2d 413, 419, n 6), but in this instance the damage was ineradicable and transcended the court's cogent efforts in striking the testimony and instructing the jury to disregard it. Accordingly, the defendant's motion for a mistrial should have been granted, and a new trial is called for (People v Cruz, 100 AD2d 882).

The majority, however, does not reach this issue, holding that the defendant's kidnapping conviction must be reversed and the indictment dismissed under the kidnapping-merger rule.

The victim testified that on November 28, 1987, she and a friend lived in the same apartment house. She went to her

friend's apartment and asked the friend to babysit for three of her children so that she could get a prescription filled for her son. She intended to take a cab to Woodhull Hospital for that purpose. The defendant, who was present in the friend's apartment, heard the conversation and called for a cab. When the cab arrived, the security guard, using the intercom, buzzed the apartment, and the victim went downstairs and got into the cab. At that moment, the defendant, uninvited and unexpected, entered the cab from the other side and ordered the driver to start driving. Beyond his having called a cab for her, and her recognizing him from around the building, the defendant and the victim were total strangers to one another. The victim was four months' pregnant.

For an appreciable period of time the defendant terrorized and threatened the victim, while forcibly restraining her in the cab, with a gun. The victim could not say precisely how long the ride lasted. The defendant has directed the court's attention to the victim's statement that it lasted "more than ten minutes." However, when she was allowed to continue her testimony the victim estimated that it lasted "about two hours." Taking this testimony in its most favorable light, as we must *(see, People v Contes,* 60 NY2d 620), there is no doubt that the period of abduction and confinement was substantial before the defendant said or did anything or decided to say or do anything evincing an intent to rape or sexually assault the victim. In that regard, it is different from the cases in which the time period during which the "kidnapping" or abduction and an underlying crime occurred are one and the same *(e.g., People v Usher,* 49 AD2d 499, *affd* 40 NY2d 763; *see also, People v Dolan,* 40 NY2d 763; *People v White,* 88 AD2d 940).

This was an abduction. It meets the definition of abduction (Penal Law § 135.00 [2]), and, hence, kidnapping in the second degree (Penal Law § 135.20). The defendant began by telling the victim that he would make her pay for "what everybody did [to] him". The victim had no idea what he was talking about. When she talked back to him, the defendant struck her repeatedly, causing her to bleed, and told the cab driver to watch him kill her. He also beat her with a gun, hitting her in the back of the head. Under forced, armed, confinement throughout, and resisting with verbal assaults, she kept asking him why, as a complete stranger, he was doing this to her. The defendant, crazed, continued to strike her, threaten her, and verbally abuse her. Ultimately, the defendant directed the cab driver to stop the car near a parking lot and to strike her,

which the driver did. The defendant pulled her out of the car, threw her on the ground, and kicked her in the stomach. By that time the victim was groggy, but recalled that the defendant "kept saying he was going to rape me as far as I can remember". She passed out. When she came to, she was on the ground, all but naked, and feeling sore all over. She located her torn coat nearby, and found her way home, about two miles distant.

The defense called no witnesses. There was no suggestion that the victim had any reason or motive to fabricate a story and incriminate an innocent man. At the trial, the jury obviously credited the victim's account of the abduction.

At the conclusion of the evidence, the court dismissed the assault counts, holding that the injury criteria were not met. At the precharge conference the court also declined to submit the attempted sexual abuse count, reasoning that under no reasonable view of the evidence could the defendant have committed attempted sexual abuse in the first degree without also committing attempted rape in the first degree. This was designed to simplify the charge to the jury, which then had to decide only two counts, attempted rape in the first degree, and kidnapping in the second degree. The court also declined to charge unlawful imprisonment in the first degree or unlawful imprisonment in the second degree. The defense asked the court not to submit the attempted rape count on the ground that the victim was unconscious and could not have "witnessed" any attempt on the defendant's part to rape her. According to the victim's testimony, she regained consciousness, while nearly unclothed, and inferred that she "must have" been raped, adding that she felt sore and "sticky", but when pressed to say what she actually observed, she acknowledged that she did not "observe" the defendant rape her or "touch her in a sexual way".

The jury, acting under proper and unchallenged instructions, found the defendant guilty of kidnapping in the second degree, and in so doing, determined that the defendant abducted the victim. In accordance with the court's instructions, the jury could not have found the defendant guilty unless it concluded that "the Defendant * * * forced [the victim] to remain inside a taxicab and ride to a location to which she did not intend to go [d]uring which, the Defendant threatened her and displayed what appeared to be a gun and struck her with it, thus restricting [her] movement in such a manner as to interfere substantially with her liberty". By finding the defen-

dant not guilty of attempted rape, the jury apparently concluded that because the victim had passed out she could not with conscious certainty say that the defendant made an actual attempt at sexual penetration. In this, the jury practically mirrored the victim's own acknowledgment when she candidly answered, "No" when the defense attorney asked her whether she actually saw the defendant sexually attack or rape her—a point which defense counsel stressed in his summation.

On appeal *the defense does not claim that the case was lacking in proof that the defendant forcibly restrained and terrorized the victim in an extended cab ride around Brooklyn,* or that he then left her, practically naked, in a parking lot two miles from her home. The defendant's argument, which the majority accepts, is that the kidnapping (i.e., the abduction) "was merely designed to take her to a place, away from her apartment building, where those other crimes [sex crimes and assault] could be committed more easily". Accordingly, the argument goes, "the kidnapping count merged into the other charged crimes". I disagree.

There is a time and place for the kidnapping-merger doctrine. It is a judicially crafted rule *(People v Cassidy,* 40 NY2d 763, 765), designed to protect defendants from the inequities of prosecutorial overcharging. Every forcible rape and most robberies necessarily involve a form of restraint by which the victim is being forcibly confined, to say the least. To the extent that kidnapping entails a forcible confinement of the victim, there is generally an overlap with rape and robbery, but it is plain to see that most robberies and rapes, without more, are not legally amenable to an additional charge of kidnapping. Because robbery and rape indictments do not ipso facto spell kidnapping, the inclusion of a kidnapping count, based merely on the incidental but necessary condition of restraint, amounts to prosecutorial excess. That is what the Court of Appeals taught us a quarter of a century ago in *People v Levy* (15 NY2d 159, *cert denied* 381 US 938).

To put an extreme case, if, for example, someone is bent on striking someone else, and pulls the victim into an alleyway to do so, there is a component of asportation and confinement, but it should not, without more, qualify as kidnapping. That would subvert the law by imposing a high level felony on what might otherwise be a misdemeanor assault. Some courts have expressed the kidnapping-merger rule as a device to prevent the "gross distortion of lesser crimes into a much

more serious crime by excess of prosecutorial zeal" *(People v Miles,* 23 NY2d 527, 540, *cert denied* 395 US 948; *People v Pellot,* 105 AD2d 223, 232), in instances where the confinement or asportation is subsidiary to the main crime *(People v Lombardi,* 20 NY2d 266).

In that vein, appellate courts have reversed kidnapping convictions as being incidental to the primary, sex crime objective *(e.g., People v Watts,* 48 AD2d 863, *People v Ennis,* 50 AD2d 935; *People v Brewer,* 94 AD2d 812; *People v Ennis,* 107 AD2d 707; *People v Burgess,* 107 AD2d 703; *People v Williams,* 141 AD2d 783; *People v Scattareggia,* 152 AD2d 679; *People v Doyen,* 155 AD2d 894), or to another criminal objective, such as burglary *(People v Spinks,* 58 AD2d 659), or robbery *(People v Cain,* 76 NY2d 119; *People v Parks,* 59 AD2d 543; *People v Giampetruzzi,* 60 AD2d 541; *People v Graham,* 69 AD2d 544, *vacated on other grounds* 446 US 932; *People v Androvett,* 135 AD2d 640; *People v Ortiz,* 137 AD2d 727; *People v Rodriguez,* 149 AD2d 443).

But courts have been careful to draw distinctions between asportations and confinements that are merely ancillary to another, primary criminal purpose, and those that are sufficiently independent to stand on their own, as where the asportation or confinement continues beyond or occurs after the completion of the underlying crime, be it coercion *(People v Moore,* 154 AD2d 929), robbery *(People v Riley,* 70 NY2d 523, 532; *People v Stuckey,* 56 AD2d 898; *People v Shay,* 60 AD2d 698), rape *(People v Tillman,* 69 AD2d 975; *People v Wilsey,* 99 AD2d 877 [sexual abuse]), or burglary and assault *(People v McCray,* 61 AD2d 860). Similarly, kidnapping (or unlawful imprisonment)* does not merge where the restraint and confinement is sufficiently distinct from the rape *(People v Smith,* 77 AD2d 712; *People v Brown,* 112 AD2d 1087), sexual abuse

---

* Unlawful imprisonment, like kidnapping, is subject to the merger doctrine. After *People v Levy* (15 NY2d 159, *cert denied* 381 US 938, *supra)* was decided, a number of cases were decided in which the kidnapping convictions were reversed as merged, but unlawful imprisonment convictions were allowed to survive *(e.g., People v Ennis,* 50 AD2d 935, *supra; People v Webster,* 54 AD2d 703; *People v Fraser,* 54 AD2d 965; *People v Webb,* 59 AD2d 618; *People v Jackson,* 63 AD2d 1032). The Court of Appeals, however, in *People v Geaslen* (54 NY2d 510) held that if the victim's confinement is incidental to a primary, substantive crime, unlawful imprisonment merges as well *(see, People v Stoesser,* 92 AD2d 650; *People v Santiago,* 99 AD2d 819; *People v Russell,* 127 AD2d 805, *affd* 71 NY2d 1016; *People v Bailey,* 133 AD2d 462; *People v Barfield,* 138 AD2d 497; *People v Major,* 142 AD2d 603; *People v Ellie,* 155 AD2d 685; *People v Rushings,* 159 AD2d 527).

*(People v Wilsey,* 99 AD2d 877) or the robbery *(People v Williams,* 77 AD2d 789; *People v Stein,* 119 AD2d 605; *People v Addison,* 151 AD2d 372).

The application of the merger doctrine works a grave irony in the case before us. The defendant's actions, in abducting and terrorizing the victim, are being legally excused merely because he *may* have had more in mind. Whether he had such objectives rests on speculation, but the defendant is nevertheless being rewarded with exoneration because of the possibility—unproven—that he intended more than abduction and terror. It is critical that there is absolutely no evidence that the defendant intended to rape or sexually assault the victim when he abducted her. If the defendant's calculated objective was robbery, rape, or assault, an abduction or asportation could qualify as subsidiary conduct. Given his fiendish actions, however, we can only guess whether the defendant had a particularized, calculated objective, or for that matter, any design at all, other than to terrorize a virtual stranger. Eventually, after pulling the victim from the car, and as she was lapsing into unconsciousness, the defendant announced that he wanted to rape her. By that time the defendant had already fulfilled the statutory definition and committed the crime of kidnapping in the second degree, in all of its elements. This abduction therefore stands on its own footing. It is not, as the majority apparently has it, inseparable from the events that may have followed in the parking lot, considering that there is a complete lack of proof as to what the defendant intended, beyond forcible confinement, when he held the victim captive in the cab, for what may have been as long as two hours. Nor is it any less kidnapping because he struck and assaulted the victim, purposelessly, with a gun. I know of no rule of law, or logic, which should excuse an abduction, or render it any the less so, merely because it is accompanied by irrational, physical, brutality.

The majority, on the one hand, states that the assault and the rape charges were dismissed for failure of proof, or were not credited by the jury because of a lack of proof, but on the other hand, the majority gives these crimes so much credence that they are employed as anchor crimes into which the abduction merges and vanishes. At the same time, the majority gives the defendant's announced murder intention no credence whatever, presumably because he did not carry it out. There is inconsistency in this. If the defendant did intend to kill his victim, the merger doctrine would fail because

kidnapping with intent to commit murder is an exception to the merger rule *(People v Carmichael,* 155 AD2d 983). If, on the other hand, there was a failure of proof of attempted rape, that nonproof should not be used as a pillar upon which to rest the merger.

The application of the merger doctrine works another incongruity. The doctrine has been consistently rejected in cases where kidnapping was the sole count charged. In *People v Kalyon* (142 AD2d 650), we held that "[s]ince, in the instant case, the defendant was neither charged with nor convicted of any crimes other than kidnapping * * * there are no other crimes * * * with which th[e] kidnapping * * * could merge" *(see also, People v Dodt,* 92 AD2d 1063, *revd on other grounds* 61 NY2d 408; *People v Tocco,* 114 AD2d 385; *People v Cresci,* 112 AD2d 246; *People v Rios,* 88 AD2d 1056, *affd* 60 NY2d 764; *People v Balcom,* 171 AD2d 1028). Given these cases, had the indictment been limited to kidnapping only, the prosecutor could have made a more successful argument against merger. This would, and could, put an unwarranted and inappropriate premium on draftsmanship.

### THE *USHER* CASE

*People v Usher* (49 AD2d 499, *affd* 40 NY2d 763, *supra),* dealt with a particularly troublesome variation of the merger rule, and, in my view is the strongest case for the defendant's position. It is a watershed decision—the first reported occasion in which the Appellate Division was called upon to determine whether a defendant's kidnapping conviction should be reversed after he was *acquitted* of the anchor crime (robbery) with which he was also charged. Considering that the primary purpose of merger was to stop prosecutors from piling on incidental kidnapping charges when other primary crimes (typically, robbery or rape) are established, *Usher* asked the converse: Should a kidnapping conviction be overturned when it is all that is left following an acquittal on the primary charge? In *Usher,* yes. Here, no. *Usher* is the rare instance in which a kidnapping (or unlawful imprisonment) conviction is overturned as the sole surviving count. This infrequency is understandable. The purpose of the merger rule is not to set kidnappers free. Its purpose is to punish robbery, rape, and burglary, as robbery, rape, and burglary, with no additional unfair kidnapping charges that dwarf the other counts, although subservient to them.

In *Usher (supra)*, the defendant and a confederate accosted the victim at knife-point and forcibly took her to a vacant building a minute's walk away, and took change from her pocketbook. Then they raped her. The abduction was inseparable, and the asportation "played no significant role in the crime" *(People v Usher, supra,* at 506). In *Usher*, it was the *underlying crimes* that lasted 25 minutes, not the asportation. As the Court of Appeals stated, Usher's act of abduction was "only the incidental means employed to facilitate the commission of the underlying crimes" *(People v Cassidy,* 40 NY2d 763, 768).

In the case before us, the kidnapping stands on its own footing. There was lengthy and nightmarish confinement before the defendant pulled the victim from the car and announced that he wanted to rape her. This abduction was no less the core crime than the unproven attempted rape, the purposeless assault, or the announced but abandoned intent to commit murder. It is safe to say that someone engaging a cab would scarcely regard a violent rampage of an armed intruder as "incidental" or "subservient" to anything, although it may have preceded something worse.

Given the nature of the defendant's actions, the case falls closer to others in which merger was foreclosed. In *People v Miles* (23 NY2d 527, 532, *cert denied* 395 US 948, *supra),* the Court of Appeals, stressed, among other things, the "meandering" quality of the asportation, and in *People v India* (67 AD2d 488, 495), the court, in rejecting the merger doctrine in the context of a kidnapping and burglary conviction, pointed to the "substantial" quality of the restraint. These cases parallel the case before us.

In *People v Piotter* (142 AD2d 939) the defendant forcibly restrained the victim in her bathroom for over an hour, beat her about the head and chest, and thwarted her attempt to escape. In rejecting the merger doctrine, the court held that the conduct underlying the imprisonment was not incidental to and inseparable from the other crimes (assault and menacing). The defendant's conduct in our case was certainly no milder than Piotter's and approaches the brutality inflicted upon the victim in *People v Morales* (148 AD2d 325) where merger was also rejected.

Nor was the defendant's conduct any less extreme here than in *People v Epps* (160 AD2d 171), where the defendant, subjecting the victim to two hours of cruelty, could not rely on

merger, or in *People v Salimi* (159 AD2d 658, 659), where the defendant prevented the liberation of his victim by "holding her in a place where she was unlikely to be found, i.e., a car traveling aimlessly through Queens in the middle of the night * * * or by threatening her with the use of deadly physical force, i.e., a gun". In the case before us, the defendant did both.

In sum, I cannot bring myself to believe that the merger doctrine can tie up the law in knots, creating a sort of legal paralysis, rendering it powerless to impose responsibility on a violent offender. Accordingly, I vote to reverse the judgment appealed from, and to order a new trial on the count of the indictment charging the defendant with kidnapping in the second degree.

BRACKEN, J. P., and HARWOOD, J., concur with LAWRENCE, J.; ROSENBLATT and BALLETTA, JJ., concur in part and dissent in part in an opinion by ROSENBLATT, J.

Ordered that the judgment is reversed, on the law, the indictment is dismissed, and the matter is remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50. No questions of fact have been raised or considered.